**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**NEWNAN DIVISION**

| | | |
|---|---|---|
| **SHANNON CRYSTAL CROWE, as HEIR AT LAW of STEVEN WAYNE DEESE and as ADMINISTRATOR OF THE ESTATE OF STEVEN WAYNE DEESE,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civil Action No. _____** |
| **THORATEC, LLC and ABBOTT LABORATORIES INC.,** | ) ) ) ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Shannon Crystal Crowe, as Heir at Law of Steven Wayne Deese, and as Administrator of the Estate of Steven Wayne Deese, by and through her undersigned counsel, files this Complaint against Defendants Thoratec, LLC and Abbott Laboratories Inc. ("Abbott-Thoratec), showing the Court as follows:

## NATURE OF THE ACTION

1.     On May 4, 2023, a fire originating from a defectively manufactured accessory to a medical device killed Plaintiff's father, Steven Wayne Deese ("Mr. Deese"). Plaintiff brings wrongful death and survivor claims against Abbott-Thoratec, the companies that manufactured, distributed, and sold the defective device.

2.     Early on the morning of May 4, 2023, one of Mr. Deese's neighbors in Carrollton, Georgia, saw smoke coming from the home where Mr. Deese lived. She banged on the door, received no response, and called 911.

3.     Mr. Deese had an implanted HeartMate 3 Left Ventricular Assist System

(generally, an "HM3"), manufactured, distributed, sold, and monitored by Defendants Abbott-Thoratec. The subject HM3 device implanted in Mr. Deese, including its accessories and components, is sometimes referred to as the "HM3 Device."

4.      An HM3 requires electrical power and is designed to operate while connected either to a Mobile Power Unit accessory plugged into an AC electrical outlet or to two (2) rechargeable 14-volt HeartMate Lithium-Ion batteries. A Mobile Power Unit and multiple rechargeable 14-volt batteries are thus provided to each HM3 user, as accessories to the device.

5.      To ensure continued operation of the HM3, Abbott-Thoratec instructs HM3 users to have at least two fully-charged 14-volt HeartMate Lithium-Ion batteries with them at all times.

6.      Abbott-Thoratec also provides a portable universal battery charger accessory (or "UBC") with every HM3.

7.      An HM3 UBC accommodates four (4) 14-volt HeartMate Lithium-Ion batteries at a time. The UBC can recharge batteries in all four (4) of its slots at once, or it can calibrate a battery in one of the slots while recharging batteries in the other three (3) slots.

8.      As designed, the HM3 UBC includes a power management board that, if properly manufactured, controls the power or voltage that reaches each 14-volt Lithium-Ion battery inserted in a UBC slot.

9.      Each 14-volt HeartMate Lithium-Ion rechargeable "battery" is a battery pack that includes multiple cylindrical battery cells and an electronic control / power management board, wired together inside a casing that includes contacts for charging and discharging the battery pack's stored power and a gauge that reports the battery pack's current charge level.

10.      Properly manufactured HM3 14-Volt Lithium-Ion batteries are usable for approximately 360 use/charge cycles or for 36 months from the date of manufacture, whichever

comes first.

11.    Mr. Deese's HM3 UBC, with batteries in each of its four slots, was plugged in and resting on the floor of the living room of his Carroll County, Georgia home when he fell asleep on the sofa in the living room on the night of May 3, 2023.

12.    In the early morning hours of May 4, 2023, Mr. Deese's HM3 Device's UBC and/or one or more of the rechargeable HM3 14-volt batteries installed in the UBC catastrophically failed when, due to a manufacturing defect in one of the 14-volt battery packs – the battery believed to be in slot (4) of the UBC -- a battery cell internally shorted, overheated, and experienced a thermal runaway.[1] The thermal runaway caused an explosion, resulting in a hot, fast-burning fire that melted part of the UBC and burned the battery pack installed in the adjacent slot (slot (3)) on the same side of the UBC. The fire engulfed a nearby chair and spread toxic smoke throughout the living room. Mr. Deese, who had been asleep on the couch in the living room when the fire started, died from smoke inhalation.

13.    Plaintiff brings this wrongful death and survivorship action stating product liability claims for strict liability and negligence in the manufacture of the HM3 Device, against the companies responsible for the manufacture and sale of the defective HM3 Device – Defendants Thoratec LLC and Abbott Laboratories Inc.

## PARTIES, JURISDICTION, and VENUE

### A.  The Parties

#### i.    Plaintiff

14.    Plaintiff Shannon Crystal Crowe is a citizen and resident of Douglas County,

---

[1] Although Plaintiffs' counsel provided Abbott-Thoratec counsel the serial numbers that were legible from Mr. Deese's HM3 14-volt battery packs, Abbott-Thoratec's counsel refused to identify the manufacturer of some of the battery packs and battery cells.

Georgia. Mr. Deese was not married at the time of his death and has no surviving spouse. As Mr. Deese's daughter, Ms. Crowe brings claims for her father's wrongful death pursuant to O.C.G.A. § 51-4-2.

15.     In addition, Plaintiff Ms. Crowe was duly appointed to serve as the Administrator of the Estate of Steven Wayne Deese by the Probate Court of Carroll County, Georgia. In her capacity as the Administrator of Mr. Deese's Estate, Ms. Crowe brings claims for her father's conscious pain and suffering prior to his death and for his medical and funeral expenses pursuant to O.C.G.A. § 51-4-5. Pursuant to 28 U.S.C. § 1332(c)(2), Mr. Deese's estate is deemed a citizen of Georgia.

### ii. Defendants

16.     **Defendant Thoratec LLC** is a foreign limited liability company formed under California law, whose principal place of business is at 100 Abbott Park Road, Abbott Park, Illinois, 60064. Defendant Thoratec LLC is thus deemed to be a citizen of California and Illinois.

17.     Defendant Thoratec LLC is registered and authorized to do business in Georgia and may be served with process via its Registered Agent, C T Corporation System, 289 S. Culver Street, Lawrenceville, Gwinnett County, Georgia, 30046-4805.

18.     **Defendant Abbott Laboratories Inc.** is a foreign corporation organized under Delaware law with its principal place of business at 100 Abbott Park Road, D367 AP6D, Abbott Park, Illinois, 60064. Defendant Abbott Laboratories Inc. is thus deemed to be a citizen of Delaware and Illinois.

19.     Defendant Abbott Laboratories Inc. is registered and authorized to do business in Georgia and may be served with process via its Registered Agent, C T Corporation System, 289 S. Culver Street, Lawrenceville, Gwinnett County, Georgia, 30046-4805.

20.     Defendants Thoratec LLC and Abbott Laboratories Inc. (collectively, "Abbott-Thoratec") are one and the same and/or are alter egos of each other in regard to the HM3 Device and all HeartMate devices.

**B.  Jurisdiction**

21.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

22.     This Court has personal jurisdiction over the Plaintiff because she and Mr. Deese's estate are Georgia citizens, and over the Defendants because they are registered to do business with the Georgia Secretary of State and have done and continue to do business throughout Georgia, including in the Newnan Division of this District.

**C.  Venue**

23.     Venue is appropriate in the Newnan Division of the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claim – including Mr. Deese's death and the establishment and administration of his estate – occurred in the Newnan Division of the Northern District of Georgia and because the Defendants are subject to personal jurisdiction in this judicial district. *See* 28 U.S.C. § 1391(b)-(d).

## **FACTS**

**A.  Background**

24.     Mr. Deese, who had heart failure, was implanted with the HM3 Device by surgeons at Wellstar Kennestone Hospital on January 12, 2021.

25.     Like all patients implanted with an HM3, Mr. Deese's HM3 Device was monitored, in his case, by staff at the Wellstar Kennestone Center for Cardiovascular Care Advanced Heart

Failure & LVAD Program, in conjunction with Abbott-Thoratec.

**B. The May 4, 2023 fire and its aftermath**

26.    On the night of May 3, 2023, after texting with his family, Mr. Deese fell asleep on the sofa in the living room of his home.

27.    His HM3 Device's UBC was on the floor, near a recliner, with an HM3 rechargeable 14-Volt Lithium-Ion battery in each of its four slots.

28.    HM3 14-Volt Lithium-Ion batteries "use technology that measures available battery power and counts battery usage/charge cycles. When a battery is placed in a charging pocket . . . the charger immediately checks the battery's status by reading the battery's on-board computer chip."

29.    HM3 users are advised that, for best battery performance, they should leave charged batteries in the charging pockets of the UBC until they are ready to be used, and that leaving charged batteries in the UBC will not damage them.

30.    In the early morning hours of May 4, 2023, due to a manufacturing defect in one or more of the battery cells in the 14-volt battery pack installed in slot (4) of the Abbott-Thoratec HM3 Device's UBC, the positive (anode) and negative (cathode) parts of a battery cell made electrical contact via an internal short.

31.    Due to a defect in manufacture, the complete separation within the HM3 Device's 14-volt battery cell's (or cells') positive and negative sides was not created or maintained, resulting in an internal electrical short circuit that suddenly discharged the energy in the battery beyond its normal range, causing thermal runaway resulting in a catastrophic and lethal fire.

32.    Neither power management board – not the one in the UBC, nor the one in the 14-Volt battery pack – maintained thermal management. As a result, an extremely hot, fast-burning

fire broke out and spread from the UBC, with flames engulfing a recliner, and toxic smoke spewing through the living room, where Mr. Deese had been sleeping on the sofa.

33. The resultant fire severely damaged the HM3 Device's UBC, the battery packs that had been inserted in two of the slots of the UBC (slots (3) and (4)), and the cylindrical battery cells of those two battery packs (and singed the battery packs installed in slots (1) and (2)).

34. The thermal runaway further caused an explosion, resulting in a hot, fast-burning fire that engulfed a nearby chair and spread noxious smoke throughout the living room.

35. A neighbor of Mr. Deese, who was on her way to work shortly after 6:00 a.m. on May 4, 2023, saw smoke coming from Mr. Deese's home. She stopped and banged on his front door. Receiving no response, she dialed 911 for assistance.

36. Carroll County Fire and Rescue were notified of the emergency at 6:10 a.m., arrived on the scene at 6:23 a.m., and had the fire controlled by 6:32 a.m. Unfortunately, they found Mr. Deese, on the sofa, in the living room, just inside the front door, deceased.

37. An autopsy performed by the Georgia Bureau of Investigation confirmed that Mr. Deese had succumbed to "inhalation of products of combustion."

**C.  Federal regulation of the HM3.**

38. The HM3 is classified by the United States Food and Drug Administration ("FDA") as a Class III medical device. Class III medical devices are those "purported or represented to be for a use in supporting or sustaining human life" or which "present[] a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(C)(ii).

39. Class III medical devices like the HM3 are subject to the FDA's premarket approval ("PMA") process and federal regulation. The purpose of the PMA process and federal regulation is to ensure the safety and effectiveness of medical devices that can cause serious injury or death

to consumers if not properly manufactured and distributed to hospitals in the condition approved by the FDA.

40.    A PMA application requires comprehensive data about the device's safety and efficacy, including human clinical trials, design specifications, manufacturing processes, and quality controls. A PMA application must also include proposed labeling and advertising.

41.    Defendants Abbott-Thoratec (or their predecessors) filed a PMA application for the HM3 on December 8, 2016, with amendments filed on January 10, February 21, May 22, and August 18, 2017.

42.    Pursuant to 21 C.F.R. § 814.20, the PMA application for the HM3 included, among other information, production specifications used in the manufacture and assembly of the HM3 and its accessories, a summary of nonclinical laboratory studies used to verify that the design input requirements were met, and a summary of the clinical investigations involving human subjects to establish a reasonable assurance of safety and effectiveness of the HM3.

43.    One of the HM3's production specifications required the HM3's 14-volt battery packs, each of their battery cells, and the battery management circuit board to satisfy performance standards, including thermal management.

44.    On August 23, 2017, the FDA granted PMA (P160054) for the HM3, which allowed Abbott-Thoratec to begin manufacturing it for commercial sale and distribution. The HM3 was indicated for providing short-term hemodynamic support (*e.g.*, bridge to transplant or bridge to myocardial recovery) in patients with advanced refractory left ventricular heart failure.

45.    On October 18, 2018, the FDA approved a PMA supplement (S0008), which expanded the HM3's indications to include long-term mechanical circulatory support (*i.e.*, destination therapy) in patients with advanced refractory left ventricular heart failure.

46.    By receiving PMA for the HM3, Abbott-Thoratec was required by federal law to manufacture and distribute the HM3, and its accessories, including the UBC and the 14-volt battery packs, pursuant to the design specifications approved by the FDA during the PMA process. These specifications include, but are not limited to:

a.    The 14-volt cylindrical battery cells must be made by a manufacturer that has been certified as compliant with the FDA's adopted consensus standards for lithium-ion batteries in medical devices;

b.    The HM3 UBC and 14-volt battery packs must demonstrate thermal management as a part of safe operation; and

c.    That the positive (anode) and negative (cathode) of the cylindrical battery cells must be electrically separated by an appropriate physical barrier.

47.    By receiving PMA for the HM3, Abbot-Thoratec became subject to additional federal regulation with respect to the manufacture and distribution of the device, including, but not limited to the following:

a.    Not manufacturing or causing to be manufactured an HM3 device that is adulterated;[2]

b.    Not introducing, delivering, or causing to be introduced or delivered into interstate commerce an HM3 that is adulterated;

c.    Ensuring that the methods used in, and the facilities and controls used for, the manufacture, assembly, packaging, and storage for the HM3, its accessories, and

---

[2] Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to conform to the requirements of an approved premarket approval application, or if it fails to meet established performance standards, or if the methods, facilities, or controls used for its manufacture, packing, storage, or installation are not in conformity with federal requirements. 21 U.S.C. § 351; 21 C.F.R. Part 820.1(c).

their component parts conform to Current Good Manufacturing Practices, per 21 C.F.R. § 820 *et seq.*;

d.  Establishing and maintaining procedures to ensure that the HM3, its accessories, and its component parts are produced, manufactured, and distributed in accordance with the FDA's quality system requirement of 21 C.F.R. § 820.50;

e.  Ensuring the quality of all products and materials used to make the HM3, its accessories, and their component parts, including ensuring the quality of every UBC, 14-volt battery pack, including each of the cells and the battery management circuit board within those battery packs, as approved by the FDA, per 21 C.F.R. § 820.50;

f.  Ensuring that the HM3, its accessories, and their component parts, including the UBC, the 14-volt battery packs, their battery cells and battery management circuit boards conform to the design specifications approved by the FDA, per 21 C.F.R. § 820.30(a)-(g);

g.  Verifying, through measurement, testing, and inspection that the HM3, its accessories, and their component parts, including the UBC, the battery cells and the battery management circuit board in the 14-volt battery packs, conform to the design specifications approved by the FDA, per 21 C.F.R. § 820.30(f);

h.  Establishing and maintaining procedures for validating the device design, performed under defined operating conditions, to ensure that devices conform to defined user needs and intended uses and must include testing of production units under actual or simulated use conditions, per 21 C.F.R. § 820.30(g);

i.  Establishing and maintaining procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality, per 21 C.F.R. § 820.70(h);

j.  Ensuring that all inspection, measuring and test equipment, including mechanical, automated, or electronic inspection and test equipment as part of manufacture, is suitable for its intended purposes and is capable of producing valid results and establishing and maintaining procedures to ensure that equipment is routinely calibrated, inspected, checked, and maintained, per 21 C.F.R. § 820.72;

k.  Where the results of a process cannot be fully verified by subsequent inspection and testing, validating the process[3] with a high degree of assurance and approved according to established procedures, per 21 C.F.R. § 820.75(a);

l.  Establishing and maintaining procedures for monitoring and control of manufacturing process parameters for validated processes to ensure that the specified requirements continue to be met, per 21 C.F.R. § 820.75(b);

m.  Ensuring that non-conforming HM3 component parts and non-conforming component parts of HM3 accessories (*i.e.,* those parts that deviate from the design specifications approved by the FDA in the HM3 PMA) are not used in the production process, and that non-conforming HM3 devices are not placed into the stream of commerce, per 21 C.F.R. § 820.90;

n.  Ensuring that HM3 devices and accessories are packaged in a manner consistent

---

[3] "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. *See* 21 C.F.R. § 820.3(z)(1).

with the FDA-approved PMA application and shipped so as to prevent adulteration and damage, per 21 C.F.R. § 820.130;

o.  Ensuring that HM3 devices, accessories, and their component parts are properly handled so as to prevent damage or other adverse effects that could affect the safety and effectiveness of the HM3, per 21 C.F.R. § 820.140;

p.  Ensuring that HM3 devices, accessories, and their component parts, and the materials used to produce the device, its accessories, and their component parts, are properly stored so as to prevent damage or other adverse effects that could affect the safety and effectiveness of the HM3, per 21 C.F.R. § 820.150; and

q.  Ensuring that only HM3 devices and components that have been approved for release and which comply with all FDA-approved design specifications and federal regulations are distributed into the stream of commerce.

48.    Abbott-Thoratec is further required to develop, conduct, control, and monitor production processes to ensure that each HM3 and all accessories and components conform to the PMA specification and, where deviations from approved device specifications could occur as a result of the manufacturing process, Abbott-Thoratec must establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications, including:

a.    documenting instructions, standard operating procedures (SOPs) and methods that define and control the manner of production;

b.    monitoring and control of process parameters and component and device characteristics during production;

c.    complying with specified reference standards or codes;

     d.     approving processes and process equipment; and

     e.     expressing criteria for workmanship in documented standards or by means of identified and approved representative samples. 21 C.F.R. § 820.70(a).

49.     Pursuant to 21 C.F.R. § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventative action. The procedures shall include requirements for:

     a.     analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product or other quality problems;

     b.     investigating the cause of nonconformities relating to product, processes, and the quality system;

     c.     identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

     d.     verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

     e.     implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

     f.     ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

     g.     submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

50.     Pursuant to 21 C.F.R. § 820.198, each manufacturer shall maintain complaint files. Specifically, each manufacturer is required to establish and maintain procedures for receiving, reviewing, and evaluating complaints. These procedures must ensure that all complaints involving the possible failure of a device to meet any of the manufacturer's specifications are processed, documented, reviewed, evaluated, investigated, and reported to the FDA as required by federal regulations.

51.     Abbott-Thoratec is required to file a report with the FDA no later than 30 calendar days after becoming aware of information, from any source, that reasonably suggests that the HM3 (1) may have caused or contributed to a death or serious injury or (2) has malfunctioned and this device or a similar device would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur, per 21 C.F.R. § 803.50.

52.     Abbott-Thoratec provided data to the FDA with the PMA application reflecting performance testing and functionality testing, to verify that the HM3, including all accessories and component parts, when properly manufactured in accordance with design specifications, satisfied performance requirements and demonstrated safe operation, with proper thermal management.

**D. The HM3 Device's rechargeable 14-volt battery suffered from a manufacturing defect and thus failed to satisfy the design approved by the HM3 PMA.**

53.     The post-fire condition of the HM3 Device's UBC and 14-volt battery packs shows that they failed due to a fire and explosion that were caused by thermal runaway originating from an internal short circuit in one of the lithium-ion cylindrical battery cells in a 14-volt back-up battery pack.

54.     A thermal runaway failure does not occur in the absence of a manufacturing defect in a lithium-ion cylindrical battery cell, the thermal management system incorporated in the battery management circuit board, and/or the battery pack. Battery cells and packs manufactured in

compliance with the FDA's consensus standards for lithium-ion batteries in medical devices, UL 1642, and/or battery packs used in medical devices, UL 2054, do not experience internal shorting and thermal runaway.

55.     Abbott-Thoratec failed to comply with the federal regulations and Current Good Manufacturing Practices specified above, directly and proximately causing Mr. Deese to suffer conscious pain and suffering and his wrongful death. Plaintiff asserts parallel state-law claims herein and does not allege any claims under federal law.

56.     Mr. Deese, at all relevant times, used the HM3 Device in a reasonable, appropriate, and foreseeable manner and did not cause or contribute to the circumstances of the fire or his injuries, damages, or death.

## COUNT I
## Strict Liability - Manufacturing Defect

57.     Plaintiff incorporates the facts alleged in paragraphs 1-56 above by reference.

58.     Abbott-Thoratec was responsible for Mr. Deese's HM3 Device, including its UBC and 14-volt rechargeable battery packs because they manufactured and distributed the HM3 Device.

59.     The HM3 Device was sold, in its defectively manufactured condition, to the hospital where it and its accessories were provided to Mr. Deese as a new HM3 device and accessories.

60.     The HM3 Device was defective in manufacture and reached Mr. Deese in that condition because it was manufactured in violation of the Federal Food, Drug, and Cosmetic Act and federal regulations promulgated pursuant thereto, in non-conformance with its approved PMA design, and in violation of O.C.G.A. § 51-1-11(b)(1), which parallels the federal requirements, in one or more of the following ways:

a.  The HM3 Device was adulterated because, as it was manufactured, it deviated from the design and manufacturing specifications approved by the FDA in Abbott-Thoratec's PMA application, in violation of Current Good Manufacturing Practices of 21 C.F.R. Part 820. The quality-control requirements of the CGMPs are designed to ensure that products conform to design and manufacturing specifications, including materials and implementation, so that nonconforming products do not reach the market, and that problems with products in the field are properly monitored, tracked, and reported. The CGMPs require Abbott-Thoratec to evaluate signals of unexpected or serious events of injury in the field and report to the FDA when a device causes, or is suspected to cause, injury in the field. A device that has been manufactured, monitored, packed, stored, inspected, or installed in violation of this requirement is deemed to be adulterated under 21 U.S.C. § 351(h), and a manufacturer is prohibited from introducing, delivering, or selling an adulterated device into interstate commerce under 21 U.S.C. § 331(a)–(c), (k).

b.  The HM3 Device was introduced or delivered for introduction into interstate commerce and was adulterated in violation of 21 U.S.C. §§ 331(a), 351(h), and 21 C.F.R. Part 820;

c.  The HM3 Device was adulterated in interstate commerce in violation of 21 U.S.C. §§ 331(b), 351(h) and 21 C.F.R. Part 820;

d.  The HM3 Device was received in interstate commerce, was adulterated, and was delivered for pay or otherwise in violation of 21 U.S.C. §§ 331(c), 351(h) and 21 C.F.R. Part 820; and/or

e.  The HM3 Device was adulterated while held for sale after shipment in interstate commerce in violation of 21 U.S.C. §§ 331(k), 351(h) and 21 C.F.R. Part 820.

f.  As alleged herein, Abbott-Thoratec violated specific CGMPs as previously pled (including 21 C.F.R.§§ 820.30(a)-(g), 820.50, 820.70(a), (h), 820.72, 820.75(a)-(b), 820.90, 820.100, 820.130, 820.140, 820.150, and 820.198), rendering the HM3 Device adulterated.

g.  Abbott-Thoratec's CGMP violations resulted in one of the HM3 Device's 14-volt rechargeable battery pack's battery cells being manufactured without a proper electrical separation between the anode and cathode, such that the positive and negative portions of the battery came into electrical contact, causing overheating, thermal runaway, and a fire from the HM3 14-volt battery pack.

61.  The HM3 Device was not reasonably suited for its intended use as a matter of law because of the defects in its manufacture.

62.  As a foreseeable, direct, and proximate result of the HM3 Device's aforementioned manufacturing defects, one of its 14-volt rechargeable cylindrical battery cells more likely than not internally shorted, overheated, and experienced thermal runaway, causing an explosion and a hot, smoldering fire that escaped from the UBC, causing a fast-burning fire that spewed toxic smoke throughout the room, and causing Mr. Deese to endure injury and damages, including fear, pain and suffering, mental anxiety and anguish, and his untimely death from inhaling the products of combustion.

## COUNT II
### Negligence - Manufacturing Defect

63.  Plaintiff incorporates the facts alleged in paragraphs 1-56 above by reference.

64.  Abbott-Thoratec manufactured and sold the HM3 Device provided to Mr. Deese,

including its accessory UBC and the 14-volt rechargeable lithium-ion battery packs.

65.    The HM3 Device (and the Heartmate 14-volt rechargeable lithium-ion battery packs and the UBC) were sold, in their defective condition, to the hospital and/or clinic, where, in that same condition, they were sold and distributed to Mr. Deese.

66.    The HM3 Device, (including at least one 14-volt rechargeable battery and/ or the UBC) was defective in manufacture and reached Mr. Deese in that condition, because it was manufactured in violation of the Federal Food, Drug, and Cosmetic Act and federal regulations promulgated pursuant thereto, in non-conformance with its approved PMA design, and in violation of O.C.G.A. § 51-1-11(b)(1), which parallels the federal requirements, in one or more of the following ways:

    a.    The HM3 Device was adulterated because it was manufactured in deviation from the design and manufacturing specifications approved by the FDA in Abbott-Thoratec's PMA application, in violation of Current Good Manufacturing Practices found in 21 C.F.R. Part 820. The quality-control requirements of the CGMPs are designed to ensure that Abbott-Thoratec's products conform to manufacturing specifications, including materials and implementation, so that nonconforming products do not reach the market, and that problems with products in the field are properly monitored, tracked and reported. The CGMPs require Abbott-Thoratec to evaluate signals of unexpected or serious events of injury in the field and report to the FDA when a device causes, or is suspected to cause, injury in the field. A device that has been manufactured, monitored, packed, stored, inspected, or installed in violation of this requirement is deemed to be adulterated under 21 U.S.C. § 351(h), and a manufacturer is prohibited from introducing, delivering, or selling an

adulterated device into interstate commerce under 21 U.S.C. § 331(a)–(c), (k).

b.  The HM3 Device was introduced or delivered for introduction into interstate commerce and was adulterated in violation of 21 U.S.C. §§ 331(a), 351(h) and 21 C.F.R. Part 820;

c.  The HM3 Device was adulterated in interstate commerce in violation of 21 U.S.C. §§ 331(b), 351(h) and 21 C.F.R. Part 820;

d.  The HM3 Device was received in interstate commerce, was adulterated, and was delivered for pay or otherwise in violation of 21 U.S.C. §§ 331(c), 351(h) and 21 C.F.R. Part 820; and/or

e.  The HM3 Device was adulterated while held for sale after shipment in interstate commerce in violation of 21 U.S.C. §§ 331(k), 351(h) and 21 C.F.R. Part 820.

f.  Abbott-Thoratec violated specific CGMPs as previously pled (including 21 C.F.R.§§ 820.30(a)-(g), 820.50, 820.70(a), (h), 820.72, 820.75(a)-(b), 820.90, 820.100, 820.130, 820.140, 820.150, and 820.198), rendering the HM3 Device adulterated.

g.  Specifically, Abbott-Thoratec failed to ensure that the HM3 Device's rechargeable 14-volt lithium-ion battery pack's cylindrical battery cells were manufactured to ensure electrical separation of the anode (positive) from the cathode (negative) of the cell, contrary to the design specification of the approved PMA and the FDA's consensus standards on lithium-ion batteries in medical devices.

h.  Furthermore, these CGMP violations resulted in at least one of the HM3 Device's 14-volt battery's cells being manufactured to permit its cathode and anode to come into electrical contact, causing an internal short circuit, overheating, and an

explosion allowing fire to escape from the battery pack and spread after the battery management boards in the battery and in the UBC failed, as required by the PMA, to maintain thermal management.

67.    Under Georgia law, Abbott-Thoratec had a duty to individuals, including patients like Mr. Deese, to use reasonable care in manufacturing the HM3 Device, including complying with the device's PMA, federal regulations and consensus standards designed to ensure the safe manufacture, assembly, inspection, packaging, and testing of medical devices.

68.    Abbott-Thoratec was negligent in failing to use reasonable care in manufacturing the HM3 Device, in that they failed to use reasonable care to ensure that it complied with federal requirements, including the device's PMA, manufactured Mr. Deese's HM3 Device in a manner that did not comply with federal requirements, and failed to test and inspect Mr. Deese's HM3 Device before placing it into the stream of commerce and supplying it to Mr. Deese. In so doing, Abbott-Thoratec failed to comply with manufacturing requirements imposed by the Device's PMA requirements and post-approval regulations.

69.    As a foreseeable, direct, and proximate result of Abbott-Thoratec's negligence, one of the lithium-ion cylindrical battery cells in at least one of the HM3 Device's 14-volt lithium-ion battery packs was defectively manufactured, such that the anode and cathode were not properly separated and came into electrical contact, with the resultant internal short circuit causing overheating, thermal runaway, and a hot, smoldering fire that exploded from the battery, causing Mr. Deese to suffer injury and damages, including fear, pain and suffering, mental anxiety and anguish, and his untimely death from smoke inhalation.

### COUNT III
### Costs of Litigation and Attorneys' Fees

70.    Plaintiff incorporates the facts alleged in paragraphs 1-56 above by reference.

71.     Abbott-Thoratec has acted in bad faith, been stubbornly litigious, or caused the Plaintiff unnecessary trouble and expense.

72.     Plaintiff is, accordingly, entitled to an award of the expenses of this litigation, including reasonably incurred attorneys' fees, per O.C.G.A. § 13-6-11.

WHEREFORE, Plaintiff prays that:

(a)     This Complaint be filed, Summonses issued, and service effected in accordance with law;

(b)     That Plaintiff has a trial by jury;

(c)     That Plaintiff, as Mr. Deese's daughter, have and recover from each of the named Defendants judgment in her favor for the full value of the life of her decedent father, as disclosed by the evidence and determined by the enlightened conscience of the jury pursuant to O.C.G.A. § 51-4-2;

(d)     That Plaintiff, as Administrator of Mr. Deese's Estate, have and recover from each of the named Defendants general damages for Mr. Deese's fear, pain, and suffering as disclosed by the evidence and determined by the enlightened conscience of the jury, and special damages for medical, funeral, and other expenses recoverable pursuant to O.C.G.A. § 51-4-5;

(e)     That this Court enter an order taxing all costs and expenses of these proceedings, including reasonable attorneys' fees, against Defendants pursuant to O.C.G.A. § 13-6-11; and

(f)     That Plaintiff be awarded such other and further relief as this Court deems necessary, proper, and just.

**Plaintiff demands a trial by jury of all issues so triable.**


[Date and signature on following page.]

Dated:  April 21, 2025.

Respectfully submitted,

*Michael L. McGlamry*
Michael L. McGlamry
Georgia Bar No. 492515
N. Kirkland Pope
Georgia Bar No. 584255
Jay F. Hirsch
Georgia Bar No. 357185
Kimberly J. Johnson
Georgia Bar No. 687678
Caroline G. McGlamry
Georgia Bar No. 230832
POPE, McGLAMRY, KILPATRICK,
MORRISON & NORWOOD, P.C.
3391 Peachtree Road, N.E., Suite 300
Atlanta, GA  30326
(404) 523-7706
Fax (404) 524-1648
efile@pmkm.com
ATTORNEYS FOR PLAINTIFF