# EXHIBIT A

e-Filed 7/19/2024 5:23 PM

*Tiki Brown*
**Tiki Brown**
**Clerk of State Court**
**Clayton County, Georgia**
**Ashley Murphy**

IN THE STATE COURT OF CLAYTON COUNTY
STATE OF GEORGIA

FATOU NGUDA SECKA, as the )
Surviving Spouse of )
MUHAMMEDOU TARAWALLY, )
Deceased, and as the Surviving Parent )
of MATARR MUHAMMEDOU )
TARAWALLY, a Deceased Minor; and )
AJI AMIE MBOOB, as the PERSONAL )
REPRESENTATIVE of the ESTATES )
of MUHAMMEDOU TARAWALLY )
and MATARR MUHAMMEDOU )
TARAWALLY, )
 )
      **Plaintiffs,** )
**v.** )
 )
THORATEC, LLC; ABBOTT )
LABORATORIES INC.; INVENTUS )
POWER, INC.; PANASONIC )
CORPORATION OF NORTH )
AMERICA; PANASONIC ENERGY )
CORPORATION OF AMERICA, f/k/a )
SANYO NORTH AMERICA )
CORPORATION; ASHFORD AT )
STONERIDGE APARTMENTS LP; )
ASHFORD AT STONERIDGE GP LLC; )
ASDEN MANAGEMENT LLC; ASDEN )
MANAGEMENT II LLC; ASDEN (US), )
INC.; ONSITE PROPERTY )
SOLUTIONS LLC, d/b/a JACKSON )
STAFFING GROUP; CENTURY FIRE )
PROTECTION, LLC (DELAWARE); )
and CENTURY FIRE HOLDINGS, LLC; )
 )
      **Defendants.** )

Case No. <u>2023-CV-03495</u>

e-Filed 9/25/2024 11:57 AM

*Tiki Brown*
**Tiki Brown**
**Clerk of State Court**
**Clayton County, Georgia**
**Ashley Bright**

| ORDER
**DENYING THE MOTIONS TO DISMISS
BY DEFENDANTS ABBOTT LABORATORIES INC. AND THORATEC, LLC AND
INVENTUS POWER, INC.; AND THE JOINDERS IN ABBOTT/THORATEC'S
MOTION TO DISMISS BY DEFENDANTS INVENTUS POWER, INC.; AND BY
PANASONIC CORPORATION OF NORTH AMERICA AND PANASONIC
<u>ENERGY CORPORATION, f/k/a SANYO NORTH AMERICA CORPORATION</u>**

Before the Court are:

(1) Defendants Abbott Laboratories Inc.'s and Thoratec, LLC's ("Abbott/Thoratec") Motion to Dismiss Complaint;

(2) Defendant Inventus Power, Inc.'s ("Inventus") Motion to Dismiss;

(3) Defendant Inventus' Joinder in Abbott/Thoratec's Motion to Dismiss Complaint and Motion to Dismiss on Additional Grounds;

(4) Defendants Panasonic Corporation of North America and Panasonic Energy Corporation's ("Panasonic")[1] Notice of Intent to Join Motion to Dismiss; and

(5) Plaintiffs' Motion to Strike the Panasonic Defendants' Notice of Intent to Join Motion to Dismiss.

The motions have been fully briefed, and the Court heard argument from all interested parties[2] on June 20, 2024.

UPON CONSIDERATION of the parties' written briefs and oral arguments to the Court, and, as detailed below,

The Court HEREBY HOLDS as follows: The Manufacturer Defendants' Motions to Dismiss and the Joinders therein are DENIED, and Plaintiffs' Motion to Strike is DENIED as MOOT.

---

[1] Abbott/Thoratec, Inventus, and Panasonic are collectively referred to herein, as in the Complaint, as the "Manufacturer Defendants."

[2] None of the other parties have moved to dismiss.

2

## I. Standard of Review

To be dismissed under O.C.G.A. § 9-11-12 (b)(6) for failure to state a claim, a complaint must completely "lack[] any legal basis for recovery." *Villa Sonoma at Perimeter Summit Condo. Ass'n, Inc. v. Commercial Indus. Bldg. Owners Alliance, Inc.*, 349 Ga. App. 666, 666, 824 S.E.2d 738 (2019). This requires that both:

> (1) the allegations of the complaint disclose with certainty that the claims would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought . . . .

*Scouten v. Amerisave Mtg. Corp.*, 283 Ga. 72, 73, 656 S.E.2d 820 (2008). Further, all pleadings are to be construed most favorably to the party who filed them, with any doubts resolved in the filing party's favor. *Id.* The most favorable inferences that can reasonably be drawn from the complaint are to be drawn in Plaintiffs' favor, even if contrary inferences are also possible. *Snooty Fox, Inc. v. First Am. Inv. Corp.*, 144 Ga. App. 264, 265, 241 S.E.2d 47, 48 (1977). On a motion to dismiss, the question is whether a complaint – viewed in the light most favorable to the plaintiffs – sets up a sufficient framework upon which facts, if proved, could establish a ground for relief. *See Goldston v. Bank of America Corp.*, 259 Ga. App. 690, 697, 577 S.E.2d 864 (2003).

## II. Procedural History

Plaintiffs Ms. Secka, as the surviving spouse of her husband, Muhammedou Tarawally, and as the surviving parent of their minor son, Matarr; and Ms. Mboob, as personal representative of the decedents' estates, filed their Complaint on December 1, 2023. Following an agreed extension, Abbott/Thoratec moved to dismiss Counts I-III on January 19, 2024. Panasonic answered the Complaint on January 19, 2024, before filing any motion. Inventus

3

joined Abbott/Thoratec's motion, filed a separate motion to dismiss repeating Abbott/Thoratec's arguments and including additional grounds, and subsequently answered the Complaint on February 2, 2024. Then, on February 5, 2024, Panasonic belatedly sought to join Abbott/Thoratec's motion and to add additional grounds seeking dismissal. Plaintiffs moved to strike Panasonic's attempted joinder and assertion of additional grounds as untimely and procedurally improper, and substantively opposed all grounds raised for dismissal by the Manufacturer Defendants.

**III. Facts**

These facts are taken from the Plaintiffs' Complaint, assumed as true, and viewed in the light most favorable to Plaintiffs for purposes of the Motions under O.C.G.A. § 9-11-12(b)(6).

Plaintiff Fatou Nguda Secka and her husband, decedent Muhammedou Tarawally, had a son, decedent Matarr, born in January 2019. (Compl. ¶¶ 44-47.) Mr. Tarawally was diagnosed with heart failure, and, in May 2022, was implanted with a HeartMate 3 Left Ventricular Assist Device (or "LVAD"). (Compl. ¶¶ 48-50.) That device, including its external accessories, is sometimes referred to as the "HM 3 Device."[3] Abbott/Thoratec manufactured, distributed, sold, and monitored the HM 3 Device. (Compl. ¶ 3.) The HM 3 Device's external System Controller – a small, wearable computer that communicates with the implanted pump and monitors performance – is supposed to alert the user to any alarm conditions. (Compl. ¶ 4.) The System Controller has an 11-volt back-up battery pack, which included three Panasonic-manufactured battery cells and a battery management circuit board; the battery pack was manufactured by Inventus. (Compl. ¶¶ 4-5, n. 1, ¶ 9.)

---

[3] "HM 3" refers generally to the Manufacturer Defendants' LVAD, including its accessories and all component parts.

4

On December 25, 2022, while Plaintiff Secka was working at the Atlanta airport, Mr. Tarawally remained at home with Matarr. (Compl. ¶¶ 70-71.) That afternoon, due to a manufacturing defect in a battery cell in the HM 3 Device System Controller's back-up battery pack, the battery cell short circuited. (Compl. ¶¶ 71-72.) Due to a defect in manufacture, the complete separation between the battery cell's positive and negative sides was not created or maintained, resulting in an internal electrical short, causing the battery's power to discharge, triggering thermal runaway and a catastrophic, lethal fire. (Compl. ¶ 73.)

The HM 3 Device stopped pumping Mr. Tarwally's heart, causing his death. (Compl. ¶ 75.) The fire exited the System Controller, spread onto Mr. Tarwally's clothing, body, and the bed he was resting on, and spewed smoke throughout the apartment. (Compl. ¶ 76.) The fire melted a television off the wall and shattered the back window of the master bedroom. (Compl. ¶ 77.) Matarr entered his parents' bedroom and was overcome by smoke and ash from the fire, resulting in his death. (Compl. ¶¶ 86-88.) The fire department's investigation concluded that the HM 3 Device was the source and cause of the fire. (Compl. ¶ 89.)

The HM 3 is a Class III medical device that received pre-market approval (or "PMA") from the United States Food and Drug Administration (the "FDA"). (Compl. ¶¶ 90-97.) The HM 3 PMA includes production specifications for the manufacture and assembly of the HM 3 Device, including a requirement that the System Controller, its 11-volt back-up battery pack, each of its battery cells, and the battery management circuit board satisfy performance standards, including thermal management. (Compl. ¶¶ 94-95.) Federal law requires Abbott/Thoratec (and the other Manufacturer Defendants) to manufacture and distribute the HM 3 and its accessories, including the System Controller, pursuant to the PMA specifications approved by the FDA, including demonstrating safe operation with proper thermal management, and that the positive

(anode) and negative (cathode) sides of the System Controller's back-up battery cells be electrically separated by an appropriate physical barrier. (Compl. ¶¶ 98, 104.) The Manufacturer Defendants are required to ensure that the 11-volt back-up battery pack, its battery cells, and the battery management circuit board are manufactured in conformance with the design specifications approved in the PMA, that their manufacture complies with the FDA's Current Good Manufacturing Practices ("CGMP"), and that non-conforming/ adulterated products are not manufactured or sold. (Compl. ¶ 99.) *See also* 21 C.F.R. § 814.80 ("A device may not be manufactured . . . in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device.") A reasonable inference to be drawn from these allegations is that the contracts between or among Abbott/Thoratec, Inventus, and/or Panasonic require the System Controller back-up battery pack and battery cells be manufactured in accord with the HM 3's PMA specifications.

The HM 3 Device failed due to a fire and explosion caused by thermal runaway originating from an internal short circuit in one of the lithium-ion battery cells in the 11-volt back-up battery pack. (Compl. ¶ 105.) Battery cells and packs manufactured in compliance with the FDA's consensus standards for lithium-ion batteries in medical devices, UL 1642, and/or battery packs used in medical devices, UL 2054, do not experience internal shorting and thermal runaway. (Compl. ¶ 106.) Although the Complaint identifies violations of PMA manufacturing requirements, the Food Drug & Cosmetics Act ("FDCA") and its regulations, including CGMP, that caused the manufacturing defect and the fire that caused the decedents' injuries and deaths, it alleges only parallel Georgia products liability claims for strict liability and negligence as to manufacturing defects and negligence as to warnings defects. (Compl. ¶¶ 107, 132-155.)

Plaintiffs allege that, between 2014 and 2020, Abbott/Thoratec was aware of multiple

6

HM 3 (and identical HM 2) System Controller failures involving explosions, sparks, burning,

overheating, smoke, and injured HM 3 patients. (Compl. ¶¶ 108-125 (describing 16 HM 2/ HM 3

incidents).) Yet the Instructions for Use provided to physicians implanting the HM 3 warned only

that "[m]alfunction of the 11 Volt Lithium-Ion back-up battery may cause the System Controller

to become excessively hot. If this occurs, switch to the back-up System Controller." (Compl.

¶ 127.) Given the requirement of continuous operation of the HM 3 to keep a patient's heart

beating, Abbott/Thoratec understood the imperative (and assumed the duty) to train all users,

including patients and caregivers, on HM 3 system operation and safety. (Compl. ¶ 129.) Yet, as

to the known fire and burning hazards, the HM 3 Manual, provided to patients and caregivers,

only "cautioned": "Do not place the System Controller on bare skin for an extended time. The

System Controller surface temperature can become uncomfortably warm, especially when the

room temperature is above 104°F (40°C)." (Compl. ¶ 127.) Despite their superior knowledge of

the risk of fire from defectively manufactured System Controller back-up battery packs and

battery cells, Abbott/Thoratec did not recall the HM 3 due to this hazard,[4] never sought to

provide additional or stronger warnings, and hid and minimized the risks associated with the HM

3 System Controller from the FDA, physicians, and other medical personnel (and from patients,

their caregivers, and their families). (Compl. ¶¶ 125, 130, 149-153.)

---

[4] On February 19, 2024, Abbott/Thoratec issued voluntary a Class I recall of the HM 3 to address
a different issue. *See* https://www.fda.gov/medical-devices/medical-device-
recalls/abbottthoratec-corp-recalls-heartmate-ii-and-heartmate-3-left-ventricular-assist-system-
lvas-due, last visited July 3, 2024.

## IV. Analysis

### A. Count I -- strict liability manufacturing defect.

Georgia statutory law provides for strict liability for defective products. A manufacturer of personal property sold as new is liable in tort to "any natural person who may use, consume, or reasonably be affected by the property" and suffers an injury to his person "because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained." O.C.G.A. § 51-1-11(b)(1). A claim for strict product liability requires the plaintiff to show that "(1) the defendant was the manufacturer of the product; (2) the product, when sold, was not merchantable and reasonably suited to the use intended, and (3) the product's defective condition proximately caused plaintiffs injury." *Brazil v. Janssen Rsch. & Dev. LLC*, 196 F. Supp. 3d 1351, 1357 (N.D. Ga. 2016); *see also Chicago Hardware & Fixture Co. v. Letterman*, 236 Ga. App. 21, 510 S.E.2d 875, 877 (1999).

A plaintiff can show that a product was "not merchantable" through manufacturing, design, or marketing/packaging (warnings) defects. *Barnes v. Medtronic, Inc.*, No. 1:20-CV-04310-JPB, 2021 WL 3742436, at *2 (N.D. Ga. Aug. 24, 2021) (citing *Sharp v. St. Jude Med., S.C., Inc.*, 838 F. App'x 462, 466 (11th Cir. 2020).) A manufacturing defect is "identifiable as a deviation from some objective standard or a departure from the manufacturer's specification established for the creation of the product." *Id.* For a manufacturing defect claim a plaintiff must "allege the existence of a specific manufacturing defect that proximately caused the harm." *Id.*

Here, Plaintiffs' Complaint alleges that: (1) the Manufacturer Defendants manufactured the HM 3 Device (¶ 133); (2) the HM 3 Device, when sold, was defective because it was manufactured in violation of the FDCA and its regulations, in non-conformance with its

8

approved PMA design, and in violation of O.C.G.A. § 51-1-11(b)(1) due to CGMP violations,

because the external System Controller's back-up battery pack and a battery cell were improperly

manufactured, so that the cell's positive and negative sides were not separated, resulting in short

circuiting and thermal runaway, contrary to PMA-required thermal management (¶¶ 106, 134-

135); (3) accordingly, the HM 3 Device was not reasonably safe for its intended use (¶ 136); and

(4) as a foreseeable and proximate result of these manufacturing defects, the short circuit,

overheating, and thermal runaway caused an explosion and a hot, smoldering fire, causing the

HM 3 Device to cease pumping Mr. Tarawally's heart causing his pain, suffering, and death, and

causing Matarr's pain, suffering, and death from smoke inhalation (¶ 137.)

The Manufacturing Defendants have not challenged the sufficiency of the Complaint's

allegations, and Plaintiffs have sufficiently alleged a strict-liability manufacturing defect claim.

*See Sharp*, 838 F. App'x at 465 (reversing dismissal of a Georgia strict liability manufacturing

defect claim where complaint alleged that device's manufacturing process violated federal

regulations, including CGMP, and failed to "adhere to the commitments made to the FDA in the

PMA and supplemental PMA . . . ."); *see also Barnes*, 2021 WL 3742436, at *3; *Cooksey v.*

*Medtronic, Inc.*, No. 1:20-CV-00805, 2020 WL 10090793, at *3 (N.D. Ga. Dec. 16, 2020); *Green*

*v. Medtronic, Inc.*, No. 1:19-CV-3242, 2020 WL 4577713, at *3 (N.D. Ga. May 1, 2020).

**B. Count II - negligent manufacturing defect.**

A negligent manufacturing claim under Georgia law requires a plaintiff to allege: "(1) a

legal duty to conform to a standard of conduct for the protection of others against an

unreasonable risk of harm; (2) breach of that standard; (3) causation; and (4) some loss or

damage as a result of the alleged breach of the legal duty." *Barnes*, 2021 WL 3742436, at *3. To

avoid liability for negligent manufacturing, a manufacturer must exercise reasonable care in

manufacturing its products so that the products are reasonably safe for intended or foreseeable uses. *Id.*

Count II re-alleges that the Manufacturing Defendants manufactured the HM 3 Device, that it reached Mr. Tarawally in a defective condition due to its manufacture in violation of the FDCA and its regulations and in non-conformance with its PMA. (Compl. ¶¶ 139-141). Count II further alleges that the Manufacturer Defendants had a duty to patients like Mr. Tarawally and his family to use reasonable care in manufacturing the HM 3 Device, including complying with federal regulations, consensus standards, and requirements imposed by the Device's PMA. (Compl. ¶¶ 142-143.) And it alleges that the Manufacturer Defendants breached this duty by failing to comply with these federal requirements, including the HM 3's PMA, and that such breach proximately caused a defective battery cell to be manufactured without a proper separation between its anode and cathode. That defectively manufactured battery cell, which was included in the System Controller's battery pack, experienced a short circuit, resulting in overheating, thermal runaway, and the fire that killed Mr. Tarawally when the HM 3 Device failed and Matarr due to smoke inhalation. (Compl. ¶¶ 143-144.) These allegations sufficiently state a claim for negligence in manufacturing the HM 3 Device. *See Barnes*, 2021 WL 3742436, at *3; *Frey v. Bayer Corp.*, 499 F. Supp. 3d 1283, 1288-89 (M.D. Ga. 2020).

### C. The preemption defenses to Counts I and II

The Manufacturer Defendants contend that the manufacturing-defect claims in Counts I and II are barred by express and/or implied preemption under the Medical Device Amendments of 1976 ("MDA"). The MDA require Class III devices, like the HM 3, to complete an extensive premarket approval (or PMA) process to be sold in the U.S. market. *See Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1325 (11th Cir. 2017). Once a device has been approved through

this PMA process, the device "may not be manufactured . . . in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device." 21 C.F.R. § 814.80; (Compl. ¶ 98.)

The MDA preempts certain claims relating to PMA-approved devices. Its express preemption provision bars any claim based on a state law requirement, "which is different from, or in addition to, any requirement" under the MDA that "relates to the safety or effectiveness of the device" or any other MDA requirement. 21 U.S.C. § 360k(a). And the MDA's implied preemption provision provides that "proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337(a). Thus, implied preemption "prohibits state-law claims that seek to privately enforce duties owed to the FDA." *Mink,* 860 F.3d at 1327.

These preemption provisions allow for certain medical device claims under the PMA framework. *Godelia v. Doe 1,* 881 F.3d 1309, 1317 (11th Cir. 2018). A plaintiff must sue for conduct that violates a federal requirement (to avoid express preemption) but cannot sue only because the conduct violated that federal requirement (to avoid implied preemption). *See Mink,* 860 F.3d at 1327. However, as here, a plaintiff can proceed with claims asserting "breach of a well-recognized duty owed to her under state law" so "long as she can show that she was harmed by a violation of applicable federal law." *Id.* (quoting *Bausch v. Stryker Corp.,* 630 F.3d 546, 558 (7th Cir. 2010)).

The Manufacturer Defendants argue that, per MDA preemption, injured parties, like Ms. Secka, whose husband and child were killed by the defective HM 3 Device, and their estates, have no recourse for a defectively manufactured medical device that does mortal harm. (Abbott/Thoratec Br. at 2, 7.) But manufacturers are not given an absolute free pass, and all

11

claims seeking recovery for unsafe medical devices are not barred. MDA preemption was not intended to "have the perverse effect of granting complete immunity from [tort] liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order to provide for the safety and effectiveness of medical devices intended for human use." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 487 (1996) (quotation omitted). Rather, there is no express or implied MDA preemption where injured parties – like Plaintiffs here – sue for conduct that both violates the MDA and would give rise to a recovery under state law even absent the MDA (parallel claims).

Evaluating whether the MDA expressly preempts state law claims is a two-step process. The first question is whether the MDA has established requirements applicable to the HM 3 Device. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 321 (2008). For PMA-approved devices like the HM 3, the answer to the first question is always yes. Thus express preemption turns on: "whether [Plaintiffs'] common-law claims are based upon [] requirements with respect to the device that are 'different from, or in addition to' the federal ones, and that relate to safety and effectiveness." *Id.* at 321-22 (quoting 21 U.S.C. § 360k(a)). The answer as to Plaintiffs' claims for strict liability and negligence in the manufacture[5] of the HM 3 Device is no.

As detailed above, Plaintiffs allege that one of the HM 3 Device's System Controller's back-up battery cells was improperly manufactured, in violation of CGMPs and the HM 3's PMA, such that the positive and negative sides were not properly separated, and that this variance from the PMA requirements caused a short circuit and release of the battery's energy, ultimately resulting in thermal runaway and the fire that injured and killed Plaintiffs' decedents.

---

[5] Because the preemption analysis for strict-liability and negligent manufacturing-defect claims is nearly identical, both claims are analyzed together. *See Mink*, 860 F.3d at 1331.

12

The HM 3 Device's PMA further imposed federal requirements for compliance with the CGMP, at 21 C.F.R.§ 820 *et seq.*, which, along with multiple other federal regulations (including 21 C.F.R. §§ 820.50, 820.30(a)-(g); 820.70(a) & (h), 820.72, 820.75(a) & (b), 820.90, 820.100, 820.130, 820.140, 820.150, 820.198) were violated by the defective manufacture of the back-up battery cell and the sale of the non-conforming, or "adulterated," HM 3 Device.

Manufacturing defect claims pled with sufficient specificity regarding how a device deviated from its PMA specifications, like Plaintiffs' contentions here, are not preempted. *See Mink*, 806 F.3d at 1330-31 (further explaining that such a claim "is precisely the type the Supreme Court has told us survives express preemption"). That is because a jury verdict for a plaintiff on such a claim would not impose different or additional requirements beyond those set out by the PMA approved standards, but "would instead have simply sought recovery for [the manufacturer's] alleged deviation from those standards." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 123-24 (2d Cir. 2006). "[A]s long as the state tort law claim is premised on a violation of federal law, it survives if it does not impose new requirements on the medical device." *Mink*, 860 F.3d at 1330.

Plaintiffs' manufacturing defect claims are parallel claims, and thus not subject to express preemption, because they seek only to enforce the PMA requirements that the HM 3 Device be properly manufactured, in accordance with its approved design, when it was not. *See Barnes v. Medtronic, Inc.*, No. 1:20-CV-04310-JPB, 2021 WL 3742436, at *5-6 (N.D. Ga. Aug. 24, 2021) (manufacturing defect claims, premised on duty to use due care in manufacturing devices under Georgia law, as well as per CGMP and the device's PMA, ran parallel to the federal requirements that the devices be manufactured according to approved specifications, and thus alleged "violations of state common law and a parallel federal requirement."). The *Barnes* manufacturing

13

defect claims thus were not expressly preempted. *See id.* at *6. Neither are Plaintiffs'. *See also Mink*, 860 F.3d at 1330-31.

In *Barnes*, like here, the claims further did not seek to recover for fraud on the FDA and thus were not subject to implied preemption. *See* 2021 WL 3742436, at *6. Plaintiffs' claims here do not seek to enforce obligations that the Manufacturer Defendants owed solely to the FDA; rather, the manufacturing-defect claims seek to ensure that the HM 3 is manufactured in accordance with what the FDA required in the PMA, to ensure that the HM 3 conformed to the design that the FDA approved as safe and effective. The Complaint alleges that the failure of the Manufacturer Defendants to ensure that PMA-specific manufacturing procedures were followed caused deviations in the HM 3 Device that rendered it unsafe -- and defective under Georgia law. Like in *Cooksey v. Medtronic, Inc.*, these parallel claims are not impliedly preempted because the duty to manufacture a safe and effective device, in compliance with the PMA-approved design, was owed to the plaintiffs, not to the FDA. *See* No. 1:20-CV-00805, 2020 WL 10090793, at *9 (N.D. Ga. Dec. 16, 2020).

Many other courts have denied preemption as to products liability claims alleging specific manufacturing defects. *See id.* (holding no express or implied preemption as to manufacturing defect claims); *Frey v. Bayer Corp.*, 499 F. Supp. 3d 1283, 1288-89 (M.D. Ga. 2020) (denying preemption of Georgia negligent manufacture claims as to implanted birth control device, including allegations of violations of CGMP and other FDCA regulations resulting in manufacture inconsistent with federal requirements and a manufacturing defect that caused plaintiff's injuries); *Cline v. Advanced Neuromodulation Sys., Inc.*, 17 F. Supp. 3d 1275, 1285 (N.D. Ga. 2014) (denying preemption of negligent manufacture claim alleging defendant breached duty under federal law to adhere to CGMP requirements incorporated into a PMA

14

Supplement governing the device's manufacture and proximately caused injury; state law

negligence claim is "genuinely equivalent" to requirements under federal law because it is

premised on violations of federal duties established by the FDA). In holding that Florida

negligent manufacturing claims alleging violations of specific federal regulations were not

preempted, the court explained that documents regarding product-specific regulatory

requirements were likely unavailable before discovery. *Godelia v. Doe 1*, 881 F.3d 1309, 1320

(11th Cir. 2018) (explaining that the specifications of the FDA's PMA documents are

confidential, that there is no public access to the complete documents, and that these facts render

it more difficult for plaintiffs to allege specificity as to manufacturing defects).

Other courts have denied preemption as to manufacturing defect claims asserted as to the

HM 3. In *Edwards v. Thoratec LLC*, the court determined that the plaintiff asserted a

"quintessential parallel claim":

> she alleges that Thoratec is liable for state law manufacturing
> defect and negligence claims because it produced a device with
> asymmetrical arms that failed to prevent air from leaking at the
> cannula-cuff interface, and producing a device with asymmetrical
> arms that failed to prevent air from leaking at the cannula-cuff
> interface also violated the federal PMA requirement for the device.

532 F. Supp. 3d 786, 792 (D. Minn. 2021). Further, because Plaintiff Edwards alleged conduct

that both violates federal law and would give rise to recovery under state law in the absence of

the FDCA, implied preemption was inapplicable. *Id.* at 793. *See also McKenzie v. Abbott Labs.*,

563 F. Supp. 3d 512, 521 (M.D. La. 2021) (finding allegations that an HM 3 screw ring "was

defective because Defendant failed to monitor and control its production processes to ensure

good workmanship in violation of the applicable CGMPs" plausibly stated a non-preempted

manufacturing defect claim). Plaintiffs' Complaint alleges similar parallel manufacturing-defect

claims about the same device. In contrast, bare allegations that discovery was required to

uncover which manufacturing defects existed were insufficient to state a non-preempted manufacturing-defect claim as to the HM 3. *See Bryant v. Thoratec Corp.*, 343 F. Supp. 3d 594, 609 (S.D. Miss. 2018).

Plaintiffs have alleged a specific defect in the manufacture of one of the battery cells in the back-up battery pack, explained the battery-management circuit board's failure to ensure thermal management in the HM 3 Device System Controller, and identified specific federal regulations, including CGMPs and the HM 3's PMA, that were violated, resulting in a non-conforming battery and battery pack. This is not a case where plaintiffs generally refer to CGMP without pinpointing a manufacturing defect. *Cf. Webb v. Mentor Worldwide LLC*, 453 F. Supp. 3d 550, 558 (N.D.N.Y. 2020) (in turn, relying on *In re Medtronic, Inc. Sprint Fidelis Leads*, 592 F. Supp. 2d 1147, 1157 (D. Minn. 2009), which found CGMPs are "simply too generic, *standing alone*, to serve as the basis for . . . manufacturing defect claims" (emphasis added).) Nor did Plaintiffs simply "incant" the "magic words" that FDA regulations have been violated. *Cf. Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1301 (11th Cir. 2011). Moreover, federal courts in Georgia have repeatedly found that CGMP regulations support manufacturing defect claims that, like Plaintiffs', include specific contentions that the device was not manufactured per its PMA requirements. *See, e.g., Barnes*, 2021 WL 3742436, at *5-6; *Green*, 2020 WL 4577713, at *3; *Cline v. Advanced Neuromodulation Sys., Inc.*, 921 F. Supp. 2d. 1374, 1379 (N.D. Ga. 2012). These cases are not outliers. *See, e.g., Weber v. Allergan, Inc.*, 940 F.3d 1106, 1114 (9th Cir. 2019) (collecting cases in which CGMP regulation violations were held sufficient to support manufacturing-defect claims, including *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1331 n.3 (11th Cir. 2017).)

The Manufacturer Defendants' "adulterated" contentions (Abbott/Thoratec Br. at 20-22,)

16

are unavailing. Indeed, the MDA defines an "adulterated" medical device as one that is

"[m]anufacture[d] . . . not in conformity with applicable requirements or conditions." 21 U.S.C.

§ 351(h). Plaintiffs are suing here not to enforce the FDA's treatment of adulterated products, but

rather, because the HM 3 Device deviated from the specifications set forth in its FDA-approved

PMA, simultaneously rendering it both "adulterated" under the FDCA and not merchantable/

unsafe under parallel Georgia products-liability law (i.e., Counts I-II here). These contentions

state non-preempted manufacturing defect claims. *See Barnes*, 2021 WL 3742436, at \*3

(crediting assertions that Defendant violated numerous federal statutes and regulations "designed

to prevent the manufacture and distribution of *adulterated* products . . ." as supporting parallel

Georgia products claims (emphasis added)).[6]

### D.  Negligent warnings defect claim (Count III)

A failure to warn claim includes three elements: (1) "that the defendant had a duty to

warn"; (2) "that the defendant breached that duty"; and (3) "that the breach proximately caused

the plaintiff's injury." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010).

---

[6] *Leonard v. Medtronic* is inapt. There, a negligence per se claim alleging only general violations
of the FDCA misbranding and adulteration laws, in conclusory terms, was preempted. *See* No.
1:10-CV-03787-JEC, 2011 WL 3652311, at \*6, \*8 (N.D. Ga. Aug. 19, 2011). *Horn v. Thoratec
Corp.*, is not persuasive because its complaint contained "no allegation that the HeartMate's
design, labeling, or *methods of manufacture* deviated from those set forth in the PMA approved
by FDA." 376 F.3d 163, 177 (3d Cir. 2004) (emphasis added). In stark contrast, here, Plaintiffs'
Complaint alleges that the methods of manufacture components of the HM 3 Device's external
System Controller deviated from those set in the PMA approved by the FDA. Likewise, *Latimer
v. Medtronic, Inc.*, an unpublished September 5, 2015 Fulton County Superior Court opinion that
Inventus attached to its motion, does not address claims that the medical device deviated from its
FDA-approved manufacturing requirements. And *Haynes v. Cyberonics, Inc.*, is a summary-
judgment opinion issued before the Eleventh Circuit decided *Mink. See* No. 1:09-CV-2700-JEC,
2011 WL 3903238, at \*5 (N.D. Ga. Sept. 6, 2011). The Manufacturer Defendants cite no binding
authority that would render Plaintiffs' manufacturing defect claims preempted.

"Whether a duty to warn exists . . . depends upon [the] foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger." *Battersby v. Boyer*, 241 Ga. App. 115, 117, 526 S.E.2d 159, 162 (1999) (quoting *Yaeger v. Stith Equip. Co.*, 177 Ga. App. 835, 836, 341 S.E.2d 492 (1986)). "Such matters generally are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner." *Id.* Moreover, Georgia law imposes a continuing, post-sale duty to warn upon manufacturers. *See Bailey v. B. Braun Med., Inc.*, No. 1:16-CV-1544-LMM, 2021 WL 5037619, at *8 (N.D. Ga. Sept. 3, 2021) (citing O.C.G.A. § 51-1-11(c)).

### 1. The Complaint sufficiently pleads a negligent failure-to-warn claim.

The Complaint alleges that the Manufacturer Defendants knew of reports of at least 16 HM System Controller failures involving explosion, sparks, burning, overheating, smoke, and burned patients,[7] and that they knew of the risks presented by an HM 3 with a defectively manufactured battery cell in its System Controller. (Compl. ¶¶ 108-125, 150.) Thus, Plaintiffs contend that the Manufacturer Defendants knew, or certainly had reason to know, that the HM 3 – particularly with an improperly manufactured back-up battery pack and battery cell in its System Controller – is unreasonably dangerous for the intended use and had a duty to provide adequate warnings under both federal and Georgia law.

But the Manufacturer Defendants warned and instructed surgeons, physicians, and LVAD Coordinators only that "[m]alfunction of the 11 Volt Lithium-Ion back-up battery may cause the

---

[7] The Complaint, at ¶¶ 109-124, details some examples of these reported issues. In Answer thereto, Abbott/Thoratec stated that "the data cannot be interpreted or used in isolation to reach conclusions . . . . ." (1/19/2024 Abbott/Thoratec Answer, at ¶¶ 109-124.) At the motion to dismiss stage, Plaintiffs have not yet had the opportunity to discover the complete story of what the Manufacturer Defendants were told, learned in any investigation, did in response, provided to the FDA, considered or suggested as enhanced warnings.

System Controller to become excessively hot. If this occurs, switch to the back-up System Controller." (Compl. ¶ 127.) As Plaintiffs allege, these "warnings" minimize the danger and wholly omit any warning as to the known risk that an HM 3 System Controller, with a defectively manufactured battery, can cause a fire, burn the patient, and produce excessive smoke that is a danger to patients and their families. (Compl. ¶¶ 108-124, 128.) Despite their superior knowledge, the Manufacturer Defendants breached their duty to warn because they provided insufficient warnings, never recalled the HM 3, never provided or sought to provide additional or stronger warnings, and hid and minimized the risks associated with the HM 3 System Controller from the FDA, physicians, the Manufacturer Defendants failed to provide post-sale warnings about these issues, (Compl. ¶ 152(b) & (c),) as required by Georgia law. These warnings failures kept Mr. Tarawally's medical providers (and thus Mr. Tarawally) from knowing the true risks and dangers from an overheating System Controller and the opportunity to substitute his back-up System Controller before the fire occurred, causing both Mr. Tarawally and Matarr to experience pain, suffering, and the loss of their lives. (Compl. ¶ 155.) These allegations adequately state a claim for negligent failure to warn, even applying the learned intermediary rule.

### 2. The warnings-defect claim is not preempted.

The Manufacturer Defendants contend that the defective warnings claim of Count III is preempted. In *Medtronic, Inc. v. Lohr*, evaluating the MDA's express preemption provision, 21 U.S.C. § 360k(a), the plurality opinion found it "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." 518 U.S. 470, 487 (1996) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984)). Rather, the MDA protects manufacturers from liability when they comply with federal law, but it does not foreclose state claims based on breaches of common law duties that parallel existing federal

19

requirements. *Lohr*, 518 U.S. at 487-88 (plurality opinion); *id.* at 494-95 (majority opinion).

Applying *Riegel*'s two-part preemption test to the warnings defect claim, 552 U.S. at 321-22, the first prong is met because the PMA subjected the HM 3 to federal requirements. As to the second prong, Plaintiffs' warnings claim concerns the HM 3's safety, and the question again boils down to whether this claim imposes *additional or different* requirements relating to the HM 3's safety (or effectiveness). *See Blevins-Ellington v. CooperSurgical, Inc.*, No. 1:22-CV-00197-LMM, 2023 WL 2111346, at *12 (N.D. Ga. Jan. 17, 2023).

Devices with PMA are also subject to ongoing reporting requirements relating to the device's safety: manufacturers must "inform the FDA of new clinical investigations or scientific studies concerning the device which the applicant knows of or reasonably should know of," and must "report incidents in which the device may have caused or contributed to death or serious injury[ ] or malfunctioned in a manner that would likely cause or contribute to death or serious injury if it recurred." *Riegel*, 552 U.S. at 319. And, despite their protestations, the Manufacturer Defendants had the ability – in addition to the duty – to enhance their HM 3 warnings prior to the FDA's approval of such warnings. *See* 21 C.F.R. § 814.39(d). Indeed, manufacturers can voluntarily recall their devices that have received PMA from the FDA, as Abott/Thoratec did with the HM 3 in February 2024. (*See supra* n. 4.)

*Mack v. CooperSurgical, Inc.*, is instructive. *See* No. 1:22-cv-54-RAH, 2023 WL 2653365 (M.D. Ala. Mar. 27, 2023). There, the court noted that, Alabama law (like Georgia law) permits negligence and strict liability claims against product manufacturers that rest on common law duties owed to individuals. *Id.* (citing *Casrell v. Altec Indus., Inc.*, 335 So. 2d 128, 132-33 (Ala. 1976); *Ex parte Chevron Chem. Co.*, 720 So. 2d 922, 924-25 (Ala. 1998), and *Mink*, 860 F.3d at 1331 (making similar observation about common law duties under Florida law)). As the

*Mack* court noted, the plaintiffs, like those in *Mink* and *Blevins-Ellington*, alleged violations of these state common law duties owed to them. *Id.* (citing *Mink*, 860 F.3d at 1333-34; *Blevins-Ellington*, 2023 WL 2111346, at *13). More specifically, the plaintiffs alleged that the Defendants owed them duties, *inter alia*, to warn of the risk of harm, and to exercise ordinary care, each of which they connected "to parallel federal requirements—for example, the requirement that the Defendants 'obtain[ ] approval for changes in the . . . warnings/marketing approved by the FDA.'" *Id.* Further, as in *Mink* and *Blevins-Ellington*, the plaintiffs "acknowledged the risk of preemption and explicitly limited their pleadings to parallel violations of federal law." *Id.* In these circumstances, there was no express preemption. *See id.*

Analogously, here, Plaintiffs alleged that the Manufacturer Defendnats owed a longstanding duty under Georgia law to warn of the risk of harm, and to exercise ordinary care, as connected to parallel federal requirements, including that they seek and obtain FDA approval for warnings/ marketing changes when they learn of increased risks. (*E.g.*, Compl. ¶¶ 127-130, 148.) Plaintiffs further confined their claims to parallel violations of federal law. (Compl. ¶ 107.) Accordingly, as in *Mack* and *Blevins-Ellington*, Plaintiffs' warnings claim are not subject to express preemption.

Further, implied preemption does not bar Count III. Although Plaintiffs discuss obligations that Abbott/Thoratec owed to the FDA, including the reporting and investigation of adverse events (*e.g.*, Compl. ¶ 152(h)), their warnings claims are based on traditional state tort duties, and the continuing duty to warn under Georgia law. (Compl. ¶ 152(b) & (c).) As discussed in *Mack*, although the MDA impliedly preempts "state-law fraud-on-the-FDA claims," *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001), it generally does not impliedly preempt "traditional state tort law causes of action that predated the federal

enactments[ ] and did not implicate a duty owed to the FDA[.]" 2023 WL 2653365 at *8 (quoting

*Mink,* 860 F.3d at 1330). The *Mack* plaintiffs' failure to warn claim alleged that the Defendants

had a continuing duty to warn them regarding the medical device's "unreasonable risk of

migration" but failed to do so. *See id.* They, like Plaintiffs here, rely on "traditional state tort law

which had predated the federal enactments," and their claims did not "implicate a duty owed to

the FDA." *See id.* (citing supporting cases).[8] It cannot be said that allegations in Count III of the

Complaint disclose with certainty that the claim would not be entitled to relief under any state of

provable facts asserted in support thereof, or that Abbott/Thoratec have shown that the Plaintiffs

could not possibly introduce evidence within the framework of the Complaint sufficient to

warrant a grant of the relief sought. *Scouten v. Amerisave Mtg. Corp.,* 283 Ga. 72, 73, 656 S.E.2d

820 (2008). Accordingly, the Motion(s) to Dismiss Count III is (are) DENIED.

### E. The Biomaterials Access Assurance Act does not provide immunity.

Plaintiffs have argued that neither Inventus nor Panasonic is a "biomaterials supplier"

under the Biomaterials Access Assurance Act, 21 U. S.C. § 1601 *et seq.,* (the "BAAA"). Even

assuming, without determining, that Inventus and Panasonic could qualify as a "biomaterials

supplier," the BAAA would not provide immunity to these Manufacturer Defendants. Even if

Inventus and Panasonic were "biomaterials suppliers," they would remain liable for their own

failures to meet applicable contractual requirements or specifications, including the PMA

requirements, in the manufacture of the 11-volt back-up battery pack and the battery cells, per 21

U.S.C. § 1604(a)(3) and (d).[9] At the pleadings stage, copies of the contracts among Abbott/

---

[8] As Plaintiffs' counsel argued, Congress could have expressly preempted state law failure-to-warn claims, but it did not do so.

[9] That said, Inventus is not entitled to BAAA immunity because it is a "manufacturer" under the BAAA. An implant "manufacturer" is any entity engaged in the manufacture, preparation . . . of the implant, and who is required to register with HHS. Under the BAAA, "register with HHS"

Thoratec, Inventus, and Panasonic as to the HM 3's System Controller back-up battery pack and battery cells were not available. But, because battery packs used in medical devices must be manufactured in compliance with the FDA's consensus standard, UL 2054, that standard is presumably incorporated in the governing contract. (*See* Compl. ¶¶ 98, 106). Likewise, the battery-pack and battery contract(s) presumably require(s) compliance with the PMA, including compliance with CGMP. (Compl. ¶ 99). The Complaint alleges that the HM 3 Device's external System Controller, particularly its back-up battery pack and the incorporated battery cells, failed to comply with the PMA requirements in their manufacture, and that their manufacture failed to comply with CGMPs and numerous other regulatory requirements, rendering the pack and cells defective, and causing the fire that harmed and killed Matarr and Mr. Tarawally. (Compl. ¶¶ 135-37, 141-144). At the motion to dismiss stage, Plaintiffs are entitled to the reasonable inferences that Abbott/Thoratec contractually required Inventus and Panasonic to manufacture the back-up battery pack and cells in compliance with the PMA, CGMPs, and the FDA consensus standard for battery packs utilized in medical devices, UL 2054, and that Inventus and Panasonic accepted and agreed to comply with these conditions. (*See* Compl. ¶¶ 98-99, 106). Per 21 U.S.C. § 1604(a)(3) & (d), a biomaterials supplier is liable for harm proximately caused by an implant when it furnishes component parts for that implant that failed to meet applicable contractual requirements or specifications.

Plaintiffs are not, as Inventus has repeatedly argued, required to produce "evidence" detailing the manufacturing problems, (*see* Inventus' Br. at 11 (heading ii., complaining about

---

means "register with the Secretary of the Department of Health and Human Services pursuant to 21 U.S.C. § 360 and to include the implant on the list of devices filed pursuant to 21 U.S.C. 360(j)." 21 U.S.C. § 1604(b)(2)(A). Inventus is registered with HHS and listed the HM 3. *See* https://www.accessdata.fda.gov/scrIpts/cdrh/cfdocs/cfRL/rl.cfm?lid=811088&lpcd=DSQ, last visited July 12, 2024.

2023CV03495
2023CV03495

the alleged lack of "evidence")), at the motion to dismiss stage. *See Petree v. Dep't of Transportation*, 340 Ga. App. 694, 701, 798 S.E.2d 482, 489-90 (2017) (reversing dismissal because trial court improperly considered evidence in dismissing). It is enough that Plaintiffs have pled that, due to Inventus' and Panasonic's failure to comply with the PMA manufacturing requirements and the CGMPs, among other requirements, the HM 3 Device's external System Controller's back-up battery pack and its battery cells were defective and failed to satisfy the PMA requirement of thermal management and complete separation of the positive and negative poles. It is enough that Plaintiffs could – following discovery – introduce evidence within the framework of their Complaint sufficient to warrant a grant of the relief sought. *See Scouten v. Amerisave Mtg. Corp.*, 283 Ga. at 73, 656 S.E.2d 820.

WHEREFORE, IT IS ORDERED that:

(1) Abbott/Thoratec's Motion to Dismiss – as well as Inventus' and Panasonic's Joinders thereto and Inventus' separate Motion based on MDA preemption – are DENIED.

(2) Inventus' and Panasonic's Motions to Dismiss as to preemption under the Biomaterials Access Assurance Act are DENIED.

(3) Plaintiffs' Motion to Strike Panasonic's Joinder in Abbott/Thoratec's Motion to Dismiss is DENIED AS MOOT.

IT IS SO ORDERED,                     This 25 day of Sept 2024.

Judge Margaret Spencer
State Court of Clayton County, Georgia